UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— :
:
RSM PRODUCTION CORPORATION,          :
JACK J. GRYNBERG, and GRYNBERG       :
PETROLEUM COMPANY,                   :
:
        Plaintiffs,                  :
:
v.                                   :
:          Before:     WALLACH, Judge*
MIKHAIL FRIDMAN, LEN BLAVATNIK,      :          Court No.: 06-cv-11512
LEV KORCHAGIN, GREGORY BOWEN,        :
LEV MODEL, GLOBAL PETROLEUM          :
GROUP, LTD., TNK-BP LIMITED,         :
LORD JOHN BROWNE, BP, p.l.c., and    :
JOHN DOES 1-5                        :
:
        Defendants.                  :
———————————————————— :

Dated:     February 19, 2009

Law Office of Daniel L. Abrams, PLLC (Daniel L. Abrams), for Plaintiffs RSM Production
Corporation, Jack J. Grynberg, and Grynberg Petroleum Company.

Curtis, Mallet-Prevost, Colt & Mosle (Turner P. Smith and Myles Bartley), for Defendant
Leonard Blavatnik.

Paul, Weiss, Rifkind, Wharton & Garrison, LLP (Jeh Charles Johnson), for Defendant Gregory
Bowen.

Sullivan & Cromwell LLP (Daryl A. Libow and Bruce W. Hickey), for Defendants BP, p.l.c. and
John Browne.

Akin, Gump, Strauss, Hauer & Feld, LLP (Robert H. Pees, W. Randolph Teslik, and John L. Van
Sickle), for Defendant Mikhail Fridman.

White & Case LLP (Owen C. Pell, Timothy Pfeifer, and Robert M. Kelly), for Defendant TNK-
BP Limited.

* Hon. Evan J. Wallach, United States Court of International Trade, sitting by designation.

## OPINION

**Wallach, Judge:**

## I
## INTRODUCTION

This case arises out of an alleged oil and natural gas exploration contract between Plaintiffs and the Government of Grenada.  Under the alleged contract, Plaintiffs were to receive a license to conduct seismic exploration off the coast of Grenada.  That license was never issued. Plaintiffs assert claims for tortious interference with contract, tortious interference with prospective business advantages, and civil conspiracy to commit tortious interference.

Various motions are before the court.  These include: motions for dismissal on the threshold grounds of lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act and lack of personal jurisdiction; a motion to strike certain allegations and exhibits from the Third Amended Complaint; and motions for dismissal on the merits, principally on the ground that Plaintiffs have failed to state a claim upon which relief can be granted.  Plaintiffs have applied for default judgment with respect to the two non-appearing Defendants.

For the reasons set forth below, the motion to strike is granted in part and denied in part, Defendants' motions for dismissal are granted, and Plaintiffs' applications are denied.

## II
## BACKGROUND

### A
### Factual Background

#### 1
#### The Parties[1]

Plaintiff RSM Production Corporation ("RSM") is a corporation incorporated in Texas, with its business address in Colorado. (Third Amended Complaint ¶ 1.)  Plaintiff Jack J. Grynberg ("Grynberg"), an oil and natural gas professional, is a resident and citizen of Colorado. (Id.)  Plaintiff Grynberg Petroleum Company is a sole proprietorship (d/b/a) owned by the wife of Jack J. Grynberg; she is not represented in this action.[2]

Defendant Gregory Bowen ("Bowen") was, at all relevant times, Deputy Prime Minister of the Government of Grenada, as well as Grenada's Minister of Energy.[3] (Id. ¶ 5.)

--------

[1] Unless otherwise indicated, the factual allegations regarding the parties are taken from the Third Amended Complaint and do not constitute findings of fact by the court.

[2] The court was apprised of Mrs. Grynberg's status as a plaintiff in this action during oral argument, as this information does not appear anywhere in the Third Amended Complaint.  The Third Amended Complaint first characterizes Grynberg Petroleum Company as a d/b/a for Jack J. Grynberg ("Grynberg") in its introductory paragraph, and then represents that Grynberg is the "president and co-owner of Grynberg Petroleum Company." (Third Amended Complaint ¶ 13.)  When asked to discuss the basis for Grynberg and Grynberg Petroleum Company's standing to bring this action, Counsel for Plaintiffs requested the court's permission to confer with Roger A. Jatko, Counsel for the Grynberg companies. (Transcript of Oral Argument, October 15, 2008 ("Transcript Day 1"), at 88:10–18.)  After conferring with Mr. Jatko, Counsel for Plaintiffs again stated that "Grynberg Petroleum Company is merely a d/b/a for Mr. Grynberg." (Id. at 89:2–3.)  Mr. Jatko clarified this statement and informed the court that Grynberg Petroleum Company is actually a d/b/a for Mrs. Grynberg. (Id. at 89:24–25.)  Mr. Jatko also confirmed that Mrs. Grynberg is not represented in this action. (Id. at 90:11–24.)
Counsel for Plaintiffs then moved to voluntarily dismiss, without prejudice, both Jack Grynberg and Mrs. Grynberg d/b/a Grynberg Petroleum Company because, he stated, "RSM Production Company is the real party in interest here." (Transcript of Oral Argument, October 16, 2008 ("Transcript Day 2"), at 3:9–13, 4:4–5.)  Counsel for Defendants took the position that the case should be dismissed with prejudice and that "[i]f the complaint survives the motion to dismiss we can then address this issue." (Id. at 3:21–25.)  That Motion, to the extent it is properly before the court, is denied.  Mrs. Grynberg remains unrepresented in this action.

[3] Defendant Gregory Bowen ("Bowen") is no longer a member of the Grenadian Parliament. See Letter from Daniel L. Abrams, Counsel for Plaintiffs, to Judge Evan Wallach (July 10, 2008); Letter from Jeh Charles Johnson, Counsel for Bowen, to Judge Evan J. Wallach (July 14, 2008).

Defendant BP, p.l.c. ("BP") is an oil and energy company organized under the laws of the United Kingdom. (Id. ¶ 10.)  BP does business in the United States as BP Corporation North America Inc., and maintains an investor relations office in New York. (Id.)

Defendant John Browne ("Browne") is a British resident and national. (Id. ¶ 9.)  Until May 1, 2007, Browne was Group Chief Executive of BP. (Id.)

Defendant TNK-BP Limited ("TNK-BP") is a company organized in 2003 under the laws of the British Virgin Islands. (Id. ¶ 8.)  TNK-BP is jointly owned by BP (50%), the Alfa Group (25%), and Access Industries together with a large Russian conglomerate (25%). (Id.)

Defendant Mikhail Fridman ("Fridman") is Chairman of the Board of Directors of TNK-BP. (Id. ¶ 2.)  Fridman is also Chairman of the Board of Directors of the Alfa Group Consortium and Chairman of the Board of Directors of Alfa-Bank, which has offices in New York. (Id.)

Defendant Len Blavatnik ("Blavatnik") is a member of the Board of Directors of TNK-BP. (Id. ¶ 3.)  Blavatnik is believed to maintain a residence and to conduct business affairs in New York through his company, Access Industries. (Id.)

Defendant Global Petroleum Group, Ltd. ("Global Petroleum") is a company founded under the laws of Grenada in 2003. (Id. ¶ 7.)  Global Petroleum was founded by a group of individuals, including Defendant Lev Model and Lev Korchagin ("Korchagin").[4] (Id.)

Defendant Lev Model ("Model") is a Director of Global Petroleum, and he is believed to be its Chairman. (Id. ¶ 6.)  Model is a resident of Brooklyn, New York. (Id.)

---

[4] Lev Korchagin ("Korchagin") was initially named as a Defendant (Third Amended Complaint ¶ 4) but was never served.  Plaintiffs conceded, at an in-court status conference, that they remained unable to serve Korchagin and that, in the event that they were unable to effectuate service of process, the action against Korchagin should be dismissed.  Korchagin has never been served.  Thus, he is no longer a party to this action and the action is dismissed against him with prejudice. See Fed. R. Civ. P. 4(m).

**2**
**Facts Alleged in Plaintiffs' Third Amended Complaint**

According to the Third Amended Complaint,[5] RSM and the Government of Grenada entered into an exclusive Petroleum Agreement ("Agreement") in July 1996. (Third Amended Complaint ¶ 12.)  Pursuant to this Agreement, Grenada was to issue a license to RSM for "oil and natural gas exploration, development, and production." (Id.)  RSM was required to apply for such a license within 90 days after execution of the Agreement, i.e., by October 1996. (See id. ¶ 35; Declaration of Layaliza K. Soloveichik in Support of Bowen's Motion to Dismiss the Third Amended Complaint Ex. 2A, Agreement between the Government of Grenada and RSM (July 4, 1996), Art. 3.1.)  Instead, in a letter dated July 18, 1996, RSM provided notice to the Government of Grenada that it was invoking the force majeure clause contained in the Agreement. (Id. ¶ 29.)  This letter was accepted and agreed to by Grenada. (Id.)

In September 1996, Bowen advised Grynberg that in order for RSM and Grynberg to conduct business in Grenada, they would have to furnish significant bribe payments to Bowen. (Id. ¶ 15.)  After RSM and Grynberg refused to do so, "Bowen obstructed, harassed and intimidated RSM and Grynberg in their efforts to explore, develop and produce Grenada's oil and gas natural resources." (Id.)

In late January 1999, Grynberg made a presentation to the General Counsel of the British Petroleum Exploration Company ("BPX"), a wholly-owned exploration, development and production subsidiary of BP; at the time of Grynberg's presentation, Browne was the Chief Executive Officer of BPX. (Id. ¶ 14.)  The purpose of the presentation was to invite BPX to join RSM in its exploration, development and production project in offshore Grenada. (Id.)  Grynberg

---

[5] The allegations made in the Third Amended Complaint are set forth in this Section as statements of fact only to clearly indicate Plaintiffs' claims for purposes of analysis of the pending motions.  Doing so does not imply that they are, in fact, true.

provided the General Counsel of BPX with "extremely valuable confidential, exclusive, geologic, geophysical and economic information of the vast oil and natural gas potential of offshore Grenada," with the understanding that he would take this information to London and share it with Browne; the General Counsel later stated that he did share this information with Browne. (Id.)

In August 2003, TNK-BP was formed. (Id. ¶¶ 17, 28.)  Following the formation of TNK-BP, the Global Petroleum Group was formed in December 2003. (Id. ¶ 25.)  Within months after the formation of the Global Petroleum Group, "Grenada took active steps to get out of its exclusive contract with RSM." (Id. ¶ 29.)

On January 12, 2004, RSM wrote to the Prime Minister of Grenada to inform him that RSM was in the process of revoking the force majeure. (Id. ¶ 31.)  On April 14, 2004, RSM submitted an application for an "oil and natural gas exploration license" to Grenada. (Id. ¶ 32.) After an exchange of letters between Grynberg and various Ministers within the Government of Grenada (see id. ¶¶ 32-33), Bowen advised RSM of his position that RSM had not timely filed its license application by letter dated April 27, 2004 (id. ¶ 34).  RSM then filed a Request for Arbitration with the International Centre for Settlement of Investment Disputes ("ICSID") on August 31, 2004, alleging that Grenada breached its contract with RSM.[6] (Id. ¶ 40.)

In 2005 and early 2006, Grynberg was contacted by Michael Melnicke ("Melnicke"), a New York business person who is an "Ambassador-At-Large" for the Government of Grenada, appointed to that position by Grenada's Prime Minister, Keith Mitchell. (Id. ¶ 45.)  Melnicke also serves with Blavatnik as a Director of the American Jewish Congress. (Id.)  Melnicke

---

[6] The parties confirmed at oral argument that the arbitral tribunal convened by the International Centre for Settlement of Investment Disputes ("ICSID") has not yet rendered a decision regarding Grenada's alleged breach of the Agreement. (Transcript Day 1, at 111:25 to 112:1–3.)

offered to assist in resolving the dispute between RSM and Grenada. (Id. ¶ 49.)  As

compensation for his offered assistance, Melnicke asked for certain royalties based on the

amount of oil and natural gas produced pursuant to the Agreement between RSM and Grenada.

(Id.)  Between 2005 and early 2006, Melnicke proffered several versions of a proposed contract

memorializing those terms, but RSM refused to sign any of the drafts. (Id.)  During the course of

these negotiations, Melnicke "revealed" to Grynberg that Blavatnik and Fridman had bribed

Bowen so that their group could develop the petroleum reserves believed to exist off the shore of

Grenada. (Id. ¶ 50.)  Melnicke "further revealed" that Blavatnik and Fridman had also promised

to furnish bribes to Grenadian government officials in the future, and had also promised to

finance Grenada's legal defense in the ICSID arbitration. (Id.)

In June and July of 2007, certain official documentation was made public by the

Government of Grenada; these documents showed that Global Petroleum had invested more than

$4 million into Grenada's legal defense before the ICSID tribunal. (Id. ¶ 53.)  On June 21, 2007,

Bowen testified in the ICSID arbitration that Global Petroleum "is affiliated with a company that

is 'one of the biggest . . . seismic scientific investment compan[ies] and that they did work in the

US and the UK and China.'" (Id. ¶ 52.)

**B**
**Relevant Procedural Background**

Plaintiffs' original Complaint, filed on November 1, 2006, stated causes of action for

tortious interference with contract and tortious interference with prospective business advantages

against Bowen, Fridman, Blavatnik, and Korchagin.  Since the filing of the original Complaint,

Plaintiffs have amended the Complaint on three occasions.  The First Amended Complaint was

filed on August 24, 2007, at the direction of the court; the amendments to the Complaint

reflected the court's dismissal of Plaintiffs' claims for tortious interference claims against

Bowen.  After the court granted Plaintiffs' Motion to Add Parties, filed pursuant to Fed. R. Civ. P. 21, Plaintiffs filed the Second Amended Complaint on October 3, 2007, adding Model, Global Petroleum, BP, Browne, and TNK-BP as Defendants.  Plaintiffs filed a Third Amended Complaint on February 25, 2008, after receiving the court's permission to add a civil conspiracy claim against Bowen.

### III
### STANDARD OF DECISION

#### A
#### <u>Subject-Matter Jurisdiction Under The Foreign Sovereign Immunities Act</u>

A defendant which moves for dismissal of a complaint for lack of subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") "must present a '<u>prima</u> <u>facie</u> case that it is a foreign sovereign.'" <u>In Re Terrorist Attacks on September 11, 2001</u>, 538 F.3d 71, 80 (2d Cir. 2008) (quoting <u>Virtual Countries, Inc. v. Republic of S. Afr.</u>, 300 F.3d 230, 241 (2d Cir. 2002)).  Once the defendant establishes this <u>prima</u> <u>facie</u> case, the burden shifts to the plaintiff to demonstrate that one of the exceptions articulated in the FSIA applies. <u>Id.</u> Nevertheless, the defendant retains the "ultimate burden of persuasion." <u>Id.</u> (quotations omitted).

In considering such a motion, the "district court 'retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.'" <u>APWU v. Potter</u>, 343 F.3d 619, 627 (2d Cir. 2003) (quoting <u>Phoenix Consulting, Inc. v. Republic of Angl.</u>, 216 F.3d 36, 40 (D.C. Cir. 2000)).  This discretion includes "the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits."  <u>LeBlanc v. Cleveland</u>, 198 F.3d 353, 356 (2d Cir. 1999); <u>see also</u> <u>Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi</u>, 215 F.3d 247, 253 (2d Cir. 2000).

**B**
**Personal Jurisdiction**

On a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P.

12(b)(2), the plaintiff bears the burden of making a prima facie showing that jurisdiction exists.

Best Van Lines, Inc. v. Walker, 490 F.3d 239, 242 (2d Cir. 2007).  A plaintiff can make this

showing through affidavits and other supporting materials. Whitaker v. Am. Telecasting, Inc.,

261 F.3d 196, 208 (2d Cir. 2001).  "[A]ll allegations are construed in the light most favorable to

the plaintiff and doubts are resolved in the plaintiff's favor." A. I. Trade Fin., Inc. v. Petra Bank,

989 F.2d 76, 79–80 (2d Cir. 1993).  Nevertheless, conclusory allegations lacking factual

specificity do not satisfy this burden. Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 184–85 (2d

Cir. 1998).

**C**
**Motion To Strike**

On a motion to strike allegations from the pleadings pursuant to Fed. R. Civ. P. 12(f),

"[t]he court may strike . . . any redundant, immaterial, impertinent, or scandalous matter."

"[M]otions to strike are viewed with disfavor and infrequently granted." In re Merrill Lynch &

Co., Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003).  As a general proposition,

"the courts should not tamper with the pleadings unless there is a strong reason for doing so." G-

I Holdings, Inc. v. Baron & Budd, 238 F. Supp. 2d 521, 555 (S.D.N.Y. 2002) (quoting Lipsky v.

Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir.1976)).

**D**
**Failure To State A Claim**

When deciding the sufficiency of a complaint that is subject to a Fed. R. Civ. P. 12(b)(6)

motion to dismiss, the court must "accept as true all of the factual allegations contained in the

complaint" and "draw all reasonable inferences in plaintiff's favor." Hunt v. Enzo Biochem, Inc.,

530 F. Supp. 2d 580, 591 (S.D.N.Y. 2008) (citations omitted).  Notwithstanding these favorable

inferences, the claim may still fail as a matter of law, if it fails to meet the "plausibility" standard

articulated in Bell Atlantic Corp. v. Twombly, 50 U.S. 544, 127 S. Ct. 1955, 1970, 167 L. Ed. 2d

929 (2007). Hunt, 530 F. Supp. 2d at 591.  While the complaint "need not provide 'detailed

factual allegations,'" id. (quoting Twombly, 127 S. Ct. at 1964), it must "amplify a claim with

some factual allegations . . . to render the claim plausible," Iqbal v. Hasty, 490 F.3d 143, 157–58

(2d Cir. 2007); see also Twombly, 127 S. Ct. at 1977 n.3 ("Rule 8(a) 'contemplate[s] the

statement of circumstances, occurrences, and events in support of the claim presented' and does

not authorized a pleader's 'bare averment that he wants relief and is entitled to it.'") (quoting 5

Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Civil 3d § 1202, at 94–

95 (3d ed. 2004)).  Thus, the complaint must provide "the grounds upon which [the plaintiff's]

claim rests through factual allegations sufficient 'to raise a right to relief beyond a speculative

level.'" ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Twombly,

127 S. Ct. at 1965).

When assessing the legal sufficiency of a complaint, "a court need not accord 'legal

conclusions, deductions or opinions couched as factual allegations . . . a presumption of

truthfulness.'" Hunt, 530 F. Supp. 2d at 591 (quoting In re NYSE Specialists Sec. Litig., 503

F.3d 89, 95 (2d Cir. 2007)).  Indeed, "[c]onclusory allegations or legal conclusions masquerading

as facts will not suffice to defeat a motion to dismiss." Kirch v. Liberty Media Corp., 449 F.3d

388, 398 (2d Cir. 2006) (quoting Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d

Cir. 2002)); see also Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209

(1986) ("Although for the purposes of [a] motion to dismiss we must take all the factual

allegations in the complaint as true, we are not bound to accept as true a legal conclusion

couched as a factual allegation.”); De Jesus v. Sears Roebuck & Co., 87 F.3d 65, 70 (2d Cir.

1996) (holding that a complaint consisting of merely conclusory allegations unsupported by

factual assertions cannot meet the liberal requirements of Fed. R. Civ. P. 12(b)(6)); Hirsch v.

Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995) (“[C]onclusory allegations of the

legal status of a defendant’s acts need not be accepted as true for purposes of ruling on a motion

to dismiss.”).

## IV
## THE FOREIGN SOVEREIGN IMMUNITIES ACT

The Third Amended Complaint must be dismissed against Bowen for lack of subject-

matter jurisdiction under the FSIA because Bowen is a foreign sovereign entitled to the

protection of the FSIA and Plaintiffs have not demonstrated that any of the exceptions to

immunity apply.[7]  The FSIA “provides the sole basis of obtaining jurisdiction over a foreign state

in a federal court.” In Re Terrorist Attacks on September 11, 2001, 538 F.3d 71, 80 (2d Cir.

2008) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439, 109 S.

Ct. 683, 102 L. Ed. 2d 818 (1989)).  Pursuant to the FSIA, federal courts cannot exercise subject-

matter jurisdiction over a claim against a foreign state unless one of the specified exceptions

contained in the statute applies. 28 U.S.C. § 1604 (foreign states are “immune from the

jurisdiction of the courts of the United States and of the States except as provided in sections

---

[7] Bowen also argues, on the basis of the Foreign Sovereign Immunities Act (“FSIA”), improper venue pursuant to 28 U.S.C. § 1391(f). (Memorandum of Law in Support of Gregory Bowen’s Motion to Dismiss the Third Amended Complaint (“Bowen’s Motion to Dismiss”) at 25–26.)  Bowen waived the venue argument by not raising it in his first motion to dismiss. See Fed. R. Civ. P. 12(h)(1).  Although Bowen correctly states that Plaintiffs did not assert the FSIA as a basis for subject matter jurisdiction over Bowen until the Third Amended Complaint (see Bowen’s Motion to Dismiss at 25; Complaint ¶¶ 12-13 (asserting subject matter jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332)), Bowen argued in his initial Motion to Dismiss, filed in April 2007, that the Complaint should be dismissed because he was a “foreign state” within the meaning of the FSIA. (Memorandum of Law in Support of Defendant Gregory Bowen’s Motion to Dismiss the Complaint at 10–12.)  The alternative argument, improper venue pursuant to 28 U.S.C. § 1391(f), could, and should, have been raised as part of the initial Motion to Dismiss.

1605 to 1607"); see also In Re Terrorist Attacks on September 11, 538 F.3d at 80 (citing Saudi

Arabia v. Nelson, 507 U.S. 349, 355, 113 S. Ct. 1471, 123 L. Ed. 2d 47 (1993)).

**A**

**Bowen is a Foreign Sovereign Entitled to the Protection of the FSIA**

Bowen has presented a prima facie case that he is entitled to the protection of the FSIA.

First, he was the Deputy Prime Minister of Grenada, as well as its Minister of Energy, during the

time frame within which Plaintiffs' allegations arose. (Third Amended Complaint ¶ 5.)

Although the FSIA does not explicitly refer to individuals, the immunity provided by the FSIA

extends to individual officials of foreign states acting in their official capacity; these officials are

considered "agenc[ies] or instrumentalit[ies]" of the state and, accordingly, are protected by the

FSIA.[8] In Re Terrorist Attacks on September 11, 538 F.3d at 81.

Second, Plaintiffs' allegations all relate to actions that Bowen allegedly undertook within

that official capacity.  For example, Plaintiffs allege that: Bowen refused to award RSM an oil

exploration license in 2004, interjected himself into the Agreement between RSM and Grenada,

terminated Grynberg's status as Special Envoy to Venezuela, refused to participate in a maritime

boundary dispute between Grenada and Trinidad and Tobago, granted permission to other parties

besides RSM to conduct seismic exploration off the shore of Grenada, took certain actions with

respect to Grenada's U.N. seismic data, and involved himself in Grenada's defense before the

---

[8] The Circuits are split with respect to the question whether the FSIA shields individual officials of foreign governments from suit in the United States. Compare Keller v. Cent. Bank of Nig., 277 F.3d 811, 815 (6th Cir. 2002), Byrd v. Corporacion Forestal y Industrial de Olancho S.A., 182 F.3d 380, 388 (5th Cir. 1999), Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1027 (D.C. Cir. 1997), and Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1101–03 (9th Cir. 1990) (holding that the immunity granted by the FSIA extends to individual governmental officials for acts taken in their official capacity), with Enahoro v. Abubakar, 408 F.3d 877, 882 (7th Cir. 2005), and Yousuf v. Samantar, No. 07-1893, 2009 U.S. App. LEXIS 189, at *26–27 (4th Cir. January 8, 2009) (holding that it does not).  The Second Circuit has decisively adopted the majority position. In Re Terrorist Attacks on September 11, 2001, 538 F.3d 71, 80 (2d Cir. 2008) ("We join our sister circuits in holding that an individual official of a foreign state acting in his official capacity is the "agency or instrumentality" of the state, and is thereby protected by the FSIA.")

ICSID tribunal. (Third Amended Complaint ¶¶ 15, 32–38.)  Each of these alleged actions was taken in Bowen's official capacity as Grenada's Deputy Prime Minister and/or as Minister of Energy.  Because courts do not examine the underlying motive of actions taken by foreign officials in their official capacity, Bowen is not amenable to suit in the United States on the basis of any of these alleged actions. See, e.g., Leutwyler v. Office of Her Majesty Queen Rania Al Abdullah, 184 F. Supp. 2d 277, 287–88 (S.D.N.Y. 2001).

Plaintiffs do not disagree with the principle that foreign officials are not amenable to suit based on actions taken in an official capacity.  Rather, Plaintiffs contend that Bowen's actions are not protected by the FSIA because they were "illegal" and, thus, "beyond the scope" of his official duties. (Memorandum of Law in Opposition to Gregory Bowen's Motion to Dismiss the Third Amended Complaint ("Plaintiffs' Opposition to Bowen's Motion to Dismiss") at 5–6.) Plaintiffs rely on Cabiri v. Assaasie-Gyimah, 921 F. Supp. 1189, 1198 (S.D.N.Y. 1996), in

support of this contention.  According to Plaintiffs, Bowen's receipt of bribes violated Grenadian

law. (Plaintiffs' Opposition to Bowen's Motion to Dismiss at 6 (citing Declaration of Daniel L.

Abrams in Opposition to Bowen's Motion to Dismiss Ex. 2, Declaration of Anselm B. Clouden

(Grenadian Attorney observing that Bowen's receipt of a bribe would be beyond the scope of his

official duties and a criminal offense under Grenadian law)[9])).  Moreover, Plaintiffs argue,

Bowen's receipt of bribes was also a violation of international law (id. at 6 n.3 (citing Wiwa v.

Royal Dutch Petroleum Co., No. 96 Civ. 8386 (KMW), 2002 WL 319887, at *14 (S.D.N.Y.

February 28, 2002)), and "[s]overeigns are not immune from suit for their violations of

international law" (id. (quoting Amerada Hess Shipping Corp. v. Argentine Republic, 830 F.2d

421, 425 (2d Cir. 1987) ("Amerada Hess I"), rev'd, 488 U.S. 428 (1989)).  Lastly, Plaintiffs

argue that Bowen "conspired with his Co-Defendants to violate the Foreign Corrupt Practices

Act when he accepted bribe monies in furtherance of the scheme alleged in the Third Amended

Complaint." Id. at 6.

　　　　Plaintiffs' arguments reflect a profound misunderstanding of the U.S. regulatory and

jurisprudential regime governing foreign sovereign immunity.  All of the cases cited by Plaintiffs

---

[9] Clouden's Declaration lacks adequate foundation and is not properly before the court.  The court raised the sufficiency of Clouden's Declaration at oral argument. (Transcript Day 1, at 108:9 to 111:19.)  Plaintiffs' explanation was, at best, unenlightening. (See id.)  The Clouden Declaration is cited here only to demonstrate Plaintiffs' position with respect to the applicability of the FSIA.  This Circuit has recognized that "the body of decisions under [Fed. R. Civ. P.] 56 offers guidelines in considering evidence submitted outside the pleadings." Kamen v. Am. Telephone & Telegraph Co., 791 F.2d 1006, 1011(2d Cir. 1986).  Affidavits must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e).  Attorneys' affidavits testifying as to facts must be based on personal knowledge. Id.  Attorneys' affidavits testifying as to matters within their expertise must comport with the evidentiary requirements for expert testimony.  The admissibility of expert testimony in the federal courts is governed by Fed. R. Evid. 702.  Nimely v. City of N.Y., 414 F.3d 381, 395 (2d Cir. 2005).  That rule requires the trial court to first determine whether a witness is "qualified" as an expert by assessing his "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  Plaintiffs have offered Mr. Clouden's Declaration as expert testimony and, thus, "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Id., Advisory Committee Notes, 2000 Amendments.  Plaintiffs have not met this burden.

ruled on issues regarding the relationship between the FSIA and the Alien Tort Claims Act, 28 U.S.C. §1350 ("ATCA"),[10] and/or the Torture Victims Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) ("TVPA").[11]   Neither these statutes, nor the corresponding case law, support Plaintiffs' propositions.

Plaintiffs cite the Second Circuit decision in Amerada Hess I for the proposition that there is no sovereign immunity for violations of international law. (Plaintiffs' Opposition to Bowen's Motion to Dismiss at 6 n.3.)  Plaintiffs' characterization of the holding in Amerada Hess I is inaccurate.  The question in Amerada Hess I was whether Congress's enactment of the FSIA in 1976, was meant to eliminate "existing remedies in United States courts for violations of international law" by foreign states under the ATCA.  Amerada Hess I, 830 F.2d at 426.  The court held that it was not.  Id.  The Second Circuit articulated the following definition for an "international law violation" sufficient to confer jurisdiction under the ATCA:

> "The law of nations may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law."  Of course, the mere fact that many or even all nations consider an act a violation of their domestic law does not suffice to create a principle of international law.  "It is only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation [within the meaning of the statute]."

---

[10] The Alien Tort Claims Act ("ATCA") provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.  Although it was enacted in 1789, the ATCA was rarely invoked until the Second Circuit's 1980 decision in Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980).  In Filartiga, the Second Circuit "recognized the important principle" that the ATCA "validly creates federal court jurisdiction for suits alleging torts committed anywhere in the world against aliens in violation of the law of nations." Kadic v. Karadzic, 70 F.3d 232, 236 (2d Cir. 1995).

[11]  The Torture Victims Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) ("TVPA") establishes a cause of action against "individual[s] who, under actual or apparent authority, or color of law, of any foreign nation . . . subject[] an individual to torture." TVPA §§ 2(a)(1) (emphasis added).  The TVPA confirms that "official torture is prohibited by universally accepted norms of international law." Kadic, 70 F.3d at 243 (emphasis in original).

Id. at 423 (citations and internal quotations omitted).  Applying that definition the court held that

because "treaties, case law and treatises establish that [the foreign sovereign's] conduct, as

alleged . . .  violates settled principles of international law," FSIA immunity did not shield the

foreign sovereign defendant from suit in the United States.[12] Id.

This holding is not relevant to Plaintiffs' claims because Plaintiffs have not alleged that

Bowen committed a violation of the law of nations; indeed, they could not have done so

consistent with the definition provided in Amerada Hess I.  The only international agreement

cited by Plaintiffs in the Third Amended Complaint is the Convention on Bribery of Foreign

Public Officials in International Business Transactions ("OECD Convention").  (See Third

Amended Complaint ¶¶ 16, 62.)  The OECD Convention was adopted by the Negotiating

Conference of the Organisation for Economic Co-operation and Development in 1997 and

ratified by 37 countries as of March 12, 2008. OECD Convention, available at

http://www.oecd.org/department/0,3355,en_2649_34859_1_1_1_1_1,00.html.  Leaving aside the

question whether an international instrument that has been ratified by only 37 countries

sufficiently demonstrates that bribery of a foreign public official is a "violation of international

law" within the meaning of the ATCA, the fundamental flaw in Plaintiffs' contention that by

---

[12]  The Supreme Court has since clarified the standard for finding a violation of the law of nations sufficient to support a cause of action under the ATCA.  That standard requires that district courts reject those claims that allege violations of international law norms that have "less definite content and acceptance among civilized nations than the historical paradigms familiar when [the ATCA] was enacted."  Sosa v. Alvarez-Machain, 542 U.S. 692, 732, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004).  To implement this directive, the Second Circuit evaluates whether the international law norm alleged: "(1) is defined with a specificity comparable to the 18-century paradigms discussed in Sosa [i.e., offenses against ambassadors, violations of the right to safe passage, and piracy]; (2) is based upon a norm of international character accepted by the civilized world; and (3) is one that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern."  Abdullahi v. Pfizer, Inc., Nos. 05-4863-cv (L), 05-6768-cv (CON), 2009 U.S. App. LEXIS 1768 (2d Cir. January 30, 2009), at *20, *17–18.

In any case, however, that clarification does not affect the analysis that follows.  Plaintiffs have not even alleged that Bowen violated the law of nations, nor could they have under the formulation as revised under Sosa and Abdullahi.

"conspir[ing] to interfere with the existing Petroleum Agreement between RSM and Grenada,"
Bowen acted "in direct violation" of the OECD Convention (Third Amended Complaint ¶ 16) is
that there can be no direct violation of the Convention by a foreign public official; the
Convention seeks to further the OECD's mission to combat bribery by requiring signatory
countries to pass legislation making it a crime for an individual to bribe a foreign official. See
OECD Convention Art. 1(1).[13]  Thus, even under Amerada Hess I, Plaintiffs could not have
circumvented Bowen's immunity under the FSIA on the basis that the acts alleged were in
violation of international law.[14]

　　　　Plaintiffs' reliance on Cabiri and Wiwa is similarly misplaced.  In Cabiri, the court held
that the FSIA does not shield a Ghanian security official from liability under the TVPA for
committing alleged acts of torture. Cabiri, 921 F. Supp. at 1197–98.  In so holding, the court
noted that even before the TVPA was enacted, there were "few, if any, issues in international law
. . . on which opinion seems to be so united as the limitations on a state's power to torture
persons held in custody," and that "there is at present no dissent from the view that the guaranties
[of the United Nations Charter] include, at a bare minimum, the right to be free from torture." Id.

---

[13]  In the United States, the implementing legislation for the Convention on Bribery of Foreign Public Officials
in International Business Transactions ("OECD Convention") is the Foreign Corrupt Practices Act ("FCPA").
Consistent with the OECD Convention, the FCPA does not regulate the behavior of foreign public officials, but
rather of those who conduct business with such officials. See 15 U.S.C. §§ 78dd-1 to -3.  Plaintiffs' contention that
Bowen "conspired with his Co-Defendants to violate the [FCPA] when he accepted bribe monies in furtherance of
the scheme alleged in the [Third Amended Complaint]" (Plaintiffs' Opposition to Bowen's Motion to Dismiss at 8),
reflects a fundamental misunderstanding of the FCPA's provisions.

[14]  Plaintiffs' citation to Amerada Hess Shipping Corp. v. Argentine Republic, 830 F.2d 421, 425 (2d Cir. 1987)
("Amerada Hess I") suffers from a more serious defect, and that is its characterization of the case as having been
reversed by the Supreme Court "on other grounds." (Plaintiffs' Opposition to Bowen's Motion to Dismiss at 6 n.3.)
The holding in Amerada Hess I that Congress's enactment of the FSIA did not extinguish "existing remedies in
United States courts for violations of international law" by foreign states under the ATCA was expressly overruled
by the Supreme Court in Argentine Republic v. Amerada Hess, 488 U.S. 428, 433, 109 S. Ct. 683, 102 L. Ed. 2d
818 (1989) ("Amerada Hess II").  After reviewing the Second Circuit's rationale, as well as the legislative history of
the FSIA, the Court in Amerada Hess II unequivocally stated that "the text and structure of the FSIA demonstrate
Congress'[s] intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts."
Id. at 434 (emphasis added).

at 1196 (quoting <u>Filartiga</u>, 630 F.2d at 881–82).  In <u>Wiwa</u>, sovereign immunity was not even an

issue, as the plaintiffs in that case were attempting to establish the vicarious liability, under both

the ATCA and the TVPA, of various individual and corporate defendants for actions taken by the

State of Nigeria. <u>See</u> <u>Wiwa</u>, 2002 WL 319887.

Thus, Plaintiffs cannot establish subject-matter jurisdiction under the FSIA unless they

can establish that one of the statutorily enumerated exceptions apply.

**B**
**Plaintiffs Have Not Demonstrated That Any Of The Exceptions To Immunity Apply**

Plaintiffs incorrectly assert that the "commercial activity" exception of the FSIA applies

in this case.  That exception provides, in pertinent part, that:

> A foreign state shall not be immune from the jurisdiction of the courts of the
> United States in any case . . . in which the action is based . . . upon an act outside
> the territory of the United States in connection with a commercial activity of the
> foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  "Commercial activity" is defined as:

> either a regular course of commercial conduct or a particular commercial
> transaction or act.  The commercial character of an activity shall be determined by
> reference to the nature of the course of conduct or particular transaction or act,
> rather than by reference to its purpose.

<u>Id.</u> § 1603(d).  The commercial activity exception applies only when a state "exercises 'only

those powers that can also be exercised by private citizens,' as distinct from those 'powers

peculiar to sovereigns.'" <u>Saudi Arabia v. Nelson</u>, 507 U.S. 349, 360, 113 S. Ct. 1471, 123 L. Ed.

2d 47 (1993) (citation omitted).

In denying RSM's application for license to conduct oil and gas exploration off the coast

of Grenada, Bowen exercised a right that is "peculiar to sovereigns." <u>See</u> <u>id.</u>  This is because

"licensing the exploitation of natural resources is a sovereign activity." <u>MOL, Inc. v. Peoples</u>

<u>Republic of Bangl.</u>, 736 F.2d 1326, 1328 (9th Cir. 1984).  While Grenada may have "spoke[n] in

commercial terms" when it allegedly breached the Agreement, this does not warrant application of the FSIA's commercial activity exception, as the Agreement was one "that only a sovereign could have made." <u>Id.</u> at 1329.

Accordingly, this court cannot exercise subject matter jurisdiction over Plaintiffs' claims against Bowen.[15]

**V**

**PERSONAL JURISDICTION**

Browne's motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) is granted because the Third Amended Complaint does not establish a <u>prima facie</u> case that the exercise of jurisdiction over this Defendant would be appropriate.  Because Plaintiffs plead diversity of citizenship as the basis for subject-matter jurisdiction (Third Amended Complaint ¶ 57), the court must evaluate whether personal jurisdiction is authorized under the law of New York. <u>See</u> <u>Bensusan Rest. Corp. v. King</u>, 126 F.3d 25, 27 (2d Cir. 1997).

Plaintiffs assert that Browne is subject to jurisdiction in this court under either New York's general jurisdiction statute, N.Y. Civil Practice Law and Rules ("C.P.L.R.") § 301, or its long-arm jurisdiction statute, N.Y. C.P.L.R. § 302.  Browne is not subject to jurisdiction under C.P.L.R. § 301 because Plaintiffs have failed to plead facts sufficient to establish general jurisdiction.  He is not subject to jurisdiction under C.P.L.R. § 302 because Plaintiffs have failed to plead facts sufficient to establish specific jurisdiction.[16]

---

[15] Based on this holding, the court need not address Bowen's alternative basis for dismissal for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2).  This is because "[u]nder the FSIA, . . . personal jurisdiction equals subject matter jurisdiction plus valid service of process." <u>In Re Terrorist Attacks on September 11</u>, 538 F.3d at 80 (citation omitted); <u>see</u> 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject-matter] jurisdiction under subsection (a) [and] where service has been made under section 1608 of this title.").

[16] Because the exercise of personal jurisdiction is proscribed by the law of New York, the court need not address the issue of due process. <u>Bensusan Rest. Corp. v. King</u>, 126 F.3d 25, 27 (2d Cir. 1997).

**A**
**Plaintiffs Have Failed To Plead Facts Sufficient**
**To Establish General Jurisdiction Over Browne**

Plaintiffs have not alleged that Browne is doing business in New York on a systematic and continuous basis on his own behalf.  An individual cannot be subject to jurisdiction under C.P.L.R. § 301 unless he is doing business in New York on his own behalf rather than on behalf of a corporation. Brinkmann v. Adrian Carriers, Inc., 815 N.Y.S.2d 196, 199 (App. Div. 2006); Black v. USA Travel Auth., Inc., No. 99 Civ. 11278 (WMP), 2001 WL 761070, at *4 (S.D.N.Y. July 6, 2001) ("It is well-settled that 'where a corporation is doing business in New York, an officer of the corporation does not subject himself individually to 301 jurisdiction unless he is doing business in [New York] individually." (alteration in original) (citation omitted)). Jurisdiction under C.P.L.R. § 301 is appropriate only if the defendant is "engaged in such a continuous and systematic course of 'doing business' . . . as to warrant a finding of its 'presence'" in New York. Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 198 (2d Cir. 1998) (citation omitted).  The relevant inquiry "is a simple and pragmatic one: is the aggregate of [the defendant's] activities in the State such that it may be said to be 'present' in the State 'not occasionally or casually, but with a fair measure of permanence and continuity.'" Laufer v. Ostrow, 434 N.E.2d 692, 694 (N.Y. 1982) (emphasis added) (citations omitted).

The Third Amended Complaint makes no allegations at all that Browne is doing business in New York, either on behalf of a corporation or on his own behalf.  It alleges only that Browne "is a British resident and national" and that "[h]e was Group Chief Executive of BP, p.l.c. [a company 'organized under the laws of the United Kingdom'] until he stepped down on May 1, 2007." (Third Amended Complaint ¶¶ 9, 10.)  In their opposition to Browne's Motion to Dismiss and supporting materials, Plaintiffs made additional allegations in an attempt to establish that

Browne is doing business in New York on a systematic and continuous basis;[17] those allegations do not compel a different outcome for two reasons.

First, "[e]xtrinsic materials . . . cannot be used to amend pleadings that are themselves insufficient." Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 26 F. Supp. 2d 593 (S.D.N.Y. 1998) (citing Wright v. Ernst & Young LLP, 152 F.3d 169, 177 (2d Cir. 1998)). Second, Plaintiffs allege that Browne has served as an officer of a number of organizations that are based in or maintain offices in New York but do not allege that Browne is doing business individually rather than solely in his capacity as officer. (See Memorandum of Law in Opposition to BP's and John Browne's Motion to Dismiss the Second Amended Complaint ("Plaintiffs' Opposition to BP's and Browne's Motion") at 15–16; Affidavit of Jack J. Grynberg in Opposition to BP's and Browne's Motion to Dismiss ("Grynberg Aff.") ¶ 2)  Plaintiffs allege only one act in New York by Browne taken on his behalf, the delivery of a speech at Columbia University. (Plaintiffs' Opposition to BP's and Browne's Motion at 16 (citing Grynberg Aff. ¶ 2).)  That one act does not even come close to the requisite threshold of presence in New York "with a fair measure of permanence and continuity." See Laufer, 434 N.E.2d at 694.

Because Plaintiffs have failed to allege that Browne is doing business in New York on his own behalf on a systematic and continuous basis, the court cannot exercise general personal jurisdiction over Browne unless Plaintiffs establish a prima facie case that the assertion of general jurisdiction would be appropriate.

---

[17]  Those allegations are that Defendant John Browne ("Browne"): is listed with the SEC as a director of Goldman Sachs Group, Inc., a New York company; has served as a Board Member of Catalyst, a New York-based organization; has served as a Member and former Chairman of British American Business Inc., an organization with offices in New York and London; has until recently served as Chairman of the Advisory Board of Apax Partners Worldwide LLP; with offices in New York; did extensive business in New York in his former role as CEO of Defendant BP, p.l.c. ("BP"); is affiliated with Riverstone Holdings, a company that has an office in New York; and recently delivered a speech at Columbia University. (Memorandum of Law in Opposition to BP's and John Browne's Motion to Dismiss the Second Amended Complaint ("Plaintiffs' Opposition to BP's and Browne's Motion") at 15–16.)

**B**
**Plaintiffs Have Failed To Plead Facts Sufficient**
**To Establish Specific Jurisdiction over Browne**

Plaintiffs have not established a prima facie case that the exercise of long-arm

jurisdiction over Browne is warranted.  Plaintiffs assert that jurisdiction is appropriate under

Section 302(a), which provides for the exercise of specific jurisdiction over any individual who,

either "in person or through an agent: (1) transacts any business within the state or contracts

anywhere to supply goods or services in the state; or (2) commits a tortious act within the state."

N.Y. C.P.L.R. § 302(a) (emphasis added).  It is this agency-based theory of jurisdiction that

underlies Plaintiffs' assertions.

Plaintiffs are not required to establish the existence of "a formal agency relationship"

among Browne and his putative co-conspirators, Fridman and Blavatnik, to impute their contacts

with New York to Browne. See Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo,

S.R.L., 264 F.3d 32, 36 (2d Cir. 2001) (quoting Kreutter v. McFadden Oil Corp., 522 N.E.2d 40,

44 (N.Y. 1988)).  In order "[t]o be considered an agent for jurisdictional purposes, the putative

agent must have acted in the state 'for the benefit of, and with the knowledge and consent of' the

non-resident principal." Ross v. UKI Ltd., No. 02 Civ. 9297 (WHP), 2004 WL 384885, at *4

(S.D.N.Y. March 1, 2004) (quoting Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir.

1981)).  In addition, Plaintiffs must allege that the alleged principal "exercised some control over

the activities of the alleged agent." Id.

The Third Amended Complaint is entirely devoid of any allegation that Fridman and

Blavatnik were acting for Browne's benefit, with his knowledge and consent, and subject to his

control.  See First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 218 F. Supp. 2d 369, 395

(S.D.N.Y. 2002) (granting motion to dismiss for lack of personal jurisdiction because plaintiffs

22

advanced only conclusory assertions of control by a defendant over her putative agent without underlying support of any "specific factual allegations").  Accordingly, Plaintiffs' assertion of general jurisdiction over Browne must fail.

**C**

**Plaintiffs' Request for Jurisdictional Discovery is Denied**

Plaintiffs' request that the court order jurisdictional discovery if it dismisses the claims against Browne for lack of personal jurisdiction is denied because Plaintiffs have failed to allege a prima face case for personal jurisdiction.  Plaintiffs correctly state that it is within the court's discretion whether to grant jurisdictional discovery. (See Plaintiffs' Opposition to BP's and Browne's Motion at 20.)  However, Plaintiffs' assertion that the exercise of such discretion would be appropriate in this case is incorrect.

While it is within the trial court's discretion to determine whether a plaintiff is entitled to conduct jurisdictional discovery, see APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003); Langenberg v. Sofair, No. 03 CV 8339 KMK, 2006 WL 2628348, at *6–7 (S.D.N.Y. September 11, 2006),  if the plaintiff has failed to establish a prima facie case for personal jurisdiction, jurisdictional discovery is generally not granted, see Jazini by Jazini v. Nissan Motor Co., 148 F.3d 181, 186 (2d Cir. 1998); Langenberg, 2006 WL 2628348, at *6 (collecting cases).  Even when the plaintiff has failed to establish a prima facie case, jurisdictional discovery may be appropriate if the plaintiff has identified a "genuine issue of jurisdictional fact." Daventree v. Republic of Azer., 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004) (citation omitted).  Nevertheless, "[d]iscovery need not be granted to allow plaintiff to engage in an unfounded fishing expedition for jurisdictional facts." Langenberg, 2006 WL 2628348, at *6 (quoting Gear, Inc. v. L.A. Gear Cal., Inc., 637 F. Supp. 1323, 1328 (S.D.N.Y. 1986)).

Here, Plaintiffs have failed to allege a <u>prima facie</u> case of personal jurisdiction with respect to Browne, as discussed in Sections V.A–B above.  Moreover, Plaintiffs have made no factual allegations which could be proven through additional discovery that would change the outcome of this issue.  Plaintiffs' "expectation" that discovery will uncover additional evidence of Browne's general contacts with New York (<u>see</u> Plaintiffs' Opposition to BP's and Browne's Motion at 20), as well as of Browne's New York-based acts with respect to the alleged conspiracy (<u>see</u> <u>id.</u>), is, in fact, an "unfounded fishing expedition," <u>see</u> <u>Gear</u>, 637 F. Supp. at 1328, and does not adequately support its request for jurisdictional discovery.  Accordingly, Plaintiffs' request is denied.

## VI
## MOTION TO STRIKE

TNK-BP's Limited Motion to Strike Certain Paragraphs and Exhibits in the Third Amended Complaint is granted in part and denied in part.  As discussed below, TNK-BP's request that the court strike those exhibits that reference two complaints filed in actions that have not been resolved on the merits, as well as the paragraphs in the Third Amended Complaint based on those exhibits, is granted because neither complaint resulted in an adjudication on the merits or "legally permissible findings of fact."  <u>See</u> <u>In re Merrill Lynch & Co., Research Reports Sec. Litig.</u>, 218 F.R.D. 76, 78 (S.D.N.Y. 2003).  TNK-BP's request that the court strike certain allegations that it characterizes as "immaterial, scandalous, and prejudicial" is denied because TNK-BP has not demonstrated that they "can have no possible bearing" on the dispute before the court, <u>see</u> <u>Lipsky v. Commonwealth United Corp.</u>, 551 F.2d 887, 894 (2d Cir. 1976).

**A**
**The Paragraphs And Exhibits Based On Actions That Have Been Dismissed or**
**Discontinued Are Stricken From The Third Amended Complaint**

TNK-BP requests that the court strike as impertinent and immaterial Exhibits B and C

from the Third Amended Complaint, as well as all paragraphs that the court determines are based

solely on those exhibits. (Memorandum of Law in Support of Defendant TNK-BP Limited's

Motion to Strike Certain Paragraphs and Exhibits in the Third Amended Complaint ("TNK-BP's

Motion to Strike") at 4.)  That request is granted because Exhibits B and C are copies of

complaints filed in actions that were never resolved on the merits and, thus, did not result in any

findings of law or fact.

Second Circuit case law is clear that paragraphs in a complaint that are either based on, or

rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved,

are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f). Lipsky v.

Commonwealth United Corp., 551 F.2d at 892–94.  In Lipsky, the court struck a consent decree

between defendants and the SEC, as well as the underlying complaint filed with the SEC, as

immaterial.  The court reasoned that, because the consent decree was the result of a private

bargain between the parties and was not a "hearing or ruling[] or any form of decision on the

merits by the . . . court," it could have no possible bearing on the dispute before the court. Id. at

894.  For the same reasons, the complaint that preceded the consent judgment was stricken as

immaterial. Id.  More recently, this reasoning has been applied to strike all paragraphs that

referred to or relied on complaints in ongoing disputes. In re Merrill Lynch, 218 F.R.D. at 78–79.

In this case, Plaintiffs have attached the First Amended Complaint in an action entitled

Norex Petroleum Ltd. v. Access Indus., Inc., No. 02 Civ. 1499 (LTS) (KNF) (S.D.N.Y. filed

December 21, 2005) as Exhibit C to the Third Amended Complaint.  They have also attached the

Complaint in an action entitled <u>TPT Ltd. v. Blavatnik</u>, No. 605295-99 (N.Y. Sup. Ct. filed November 22, 1999) as Exhibit B.  Neither of these disputes was ultimately resolved on the merits.  The <u>Norex</u> action was dismissed for lack of subject-matter jurisdiction on September 24, 2007. (<u>See</u> TNK-BP's Motion to Strike Ex. A, Order of Dismissal, <u>Norex Petroleum Ltd. v. Access Indus., Inc.</u>, No. 02 Civ. 1499 (LTS) (KNF) (S.D.N.Y. September 24, 2007).   The <u>TPT</u> action was dismissed under a stipulation of discontinuance with prejudice on February 26, 2002.  <u>See id.</u> Ex. B, Stipulation of Discontinuance, <u>TPT Ltd. v. Blavatnik</u>, No. 605295-99 (N.Y. Sup. Ct. February 26, 2002).  Because both the <u>Norex</u> and <u>TPT</u> actions are both "preliminary steps in litigations . . . that did not result in an adjudication on the merits or legal permissible findings of fact," the complaints in both of those actions are immaterial as a matter of law. <u>See</u> <u>In re Merrill Lynch</u>, 218 F.R.D. at 78.  Accordingly, TNK-BP's motion to strike Exhibits B and C of the Third Amended Complaint is granted.  In addition, Paragraphs 19, 20, 22, and the second sentence of Paragraph 23 are stricken from the Third Amended Complaint because they are based solely on the <u>Norex</u> and <u>TPT</u> complaints.  Because Paragraphs 18, 21, and 24 are not based solely on the stricken complaints, TNK-BP's request that the court strike those paragraphs is denied.

**B**
**<u>The Paragraphs That TNK-BP Characterizes As "Immaterial, Scandalous, And</u>**
**<u>Prejudicial" Are Not Stricken From the Third Amended Complaint</u>**

TNK-BP also seeks dismissal of certain paragraphs that it characterizes as "scandalous and highly prejudicial." (TNK-BP's Motion to Strike at 6.) That request is denied because TNK-BP has not demonstrated that they "can have no possible bearing on the dispute before the court." <u>See</u> <u>Lipsky</u>, 551 F.2d at 894.

# VII
# MERITS

The Third Amended Complaint is dismissed against all Defendants for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), because it does not "contain allegations concerning each of the material elements necessary to sustain recovery under" any of the claims asserted.[18] See Mina Inv. Holdings, Ltd. v. Lefkowitz, 51 F. Supp. 2d 486, 489 (S.D.N.Y. 1999) (citation omitted).[19]  All Defendants, with the exception of Bowen, move to dismiss the Third Amended Complaint on the ground that Plaintiffs have failed to state claims for tortious interference with contract, tortious interference with prospective business advantage, or civil conspiracy.[20]

---

[18]  While the parties have submitted numerous affidavits in connection with their jurisdictional arguments, the court has not considered these affidavits in its Rule 12(b)(6) analysis.  The court's analysis in this Section is based only on the allegations contained in the Third Amended Complaint.

[19]  While the court has determined that the exercise of jurisdiction over Browne would be inappropriate, see Section V.A–B, Browne's arguments regarding the sufficiency of the Third Amended Complaint will be considered, as alternative grounds for dismissal.  In addition, while the court has determined that both the exercise of subject-matter jurisdiction under the FSIA and the exercise of personal jurisdiction with respect to Bowen would be inappropriate, see Section IV, the court nevertheless considers the sufficiency of the civil conspiracy claim with Bowen in mind.

[20]  Defendants have argued for dismissal on a variety of other grounds, including failure to join indispensable parties.  Because the Third Amended Complaint is dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), these alternative arguments need not be addressed. See Maung Ng We v. Merrill Lynch & Co., No. 99 Civ. 9687 (CSM), 2000 WL 1159835, at *12 (S.D.N.Y. August 15, 2000) (mem.) (holding that because the complaint does not state a viable claim, the court need not reach the alternative bases for dismissal).

Bowen and Defendant TNK-BP Limited ("TNK-BP") have also asserted the Act of State doctrine as an alternative basis for dismissal.  While this argument appears to have merit, given the court's holding with respect to applicability of the FSIA, it is in any event, "a substantive rather than a jurisdictional defense . . . and is more appropriately raised in a motion for summary judgment than in a motion to dismiss." Daventree Ltd. v. Republic of Azer., 349 F. Supp. 2d 736, 741 (S.D.N.Y. 2004).

TNK-BP alternatively argues that the action should be stayed pending resolution of the breach of contract claim by the ICSID tribunal.  While TNK-BP's argument may be well taken, that argument is moot because the Third Amended Complaint is dismissed for failure to state a viable cause of action with respect to any of the claims asserted.

**A**
**The Third Amended Complaint Does Not State A Claim**
**For Tortious Interference With Contract**

To state a claim for tortious interference with contract under New York law, a plaintiff must allege: (1) "the existence of a valid contract between the plaintiff and a third party"; (2) the "defendant's knowledge of the contract"; (3) the "defendant's intentional procurement of the third-party's breach of the contract without justification"; (4) "actual breach of the contract"; and (5) damages. Kirch v. Liberty Media Corp., 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting Lama Holding Co. v. Smith Barney Inc., 668 N.E.2d 1370, 1375 (N.Y. 1996)).[21]  In addition, the plaintiff must assert, with respect to each defendant, that the defendant's actions were the "but for" cause of the alleged breach – in other words, that there would not have been a breach but for the activities of the defendant. Sharma v. Skaarup Ship Mgmt. Corp., 916 F.2d 820, 828 (2d Cir. 1990) (citing Special Event Entm't v. Rockefeller Ctr., Inc., 458 F. Supp. 72, 78 (S.D.N.Y. 1978)).  "[T]he law requires some factual specificity in pleading tortious interference." World Wide Commc'ns, Inc. v. Rozar, No. 96 Civ. 1056 (MBM), 1997 U.S. Dist. LEXIS 20596, at *26 (S.D.N.Y. December 30, 1997) (citation omitted).

The Third Amended Complaint adequately alleges that a contract existed between RSM

---

[21]  The elements are similar under Colorado law.  To state a claim for tortious interference with contract under Colorado law, a plaintiff must allege: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional and improper interference with the performance of the contract by inducing or otherwise causing the third party not to perform; (4) breach of the contract; (5) damages resulting therefrom. See Krystkowiak v. W.O. Brisben Cos., Inc., 90 P.3d 859, 871 (Colo. 2004) (citation omitted); Trimble v. City & County of Denver, 697 P.2d 716, 726 (Colo. 1985).

and Grenada (Third Amended Complaint ¶ 12), that Defendants knew of the contract's existence (id. ¶ 28), and that, as a result of Defendants' alleged actions, Plaintiffs suffered damages,[22] (id. ¶ 30). These allegations are sufficient to withstand a motion to dismiss for failure to state a claim. See Kirch, 449 F.3d at 402. Plaintiffs' failure to properly allege any one of the remaining three elements with the requisite level of specificity required on a motion to dismiss would warrant dismissal of the claim; nevertheless, each of the remaining elements is discussed below.

**1**

**The Third Amended Complaint Does Not Allege That Any Of The Defendants Intentionally Procured Grenada's Breach Of The Agreement**

Fridman and Blavatnik are the only Defendants in the Third Amended Complaint alleged to have taken any action at all, but those allegations are entirely conclusory. The claim against TNK-BP is based entirely on Plaintiffs' inference that Fridman and Blavatnik were acting as TNK-BP's agents, but Plaintiffs have not alleged any facts from which an agency relationship can be inferred; an agency relationship between Fridman and Blavatnik and TNK-BP can not be "inferred" simply because Fridman and Blavatnik are Directors of TNK-BP. Similarly, the claim against BP is based entirely on Plaintiffs' "inference" that Fridman and Blavatnik were acting as BP's agents; that "inference" is not supported by any alleged underlying facts. Finally, the claim against Browne is based entirely on his former status as Group Chief Executive of BP; Plaintiffs overlook the legal principle that a corporate officer cannot be held individually liable for alleged tortious interference by its corporate employer.

---

[22] Defendant Len Blavatnik ("Blavatnik") argues that the damages claimed by Plaintiffs are too speculative to support a claim for damages because they depend on the discovery of oil off the shore of Grenada. (Leonard Blavatnik's Memorandum of Law in Support of His Motion to Dismiss Plaintiffs' Second Amended Complaint ("Blavatnik's Motion to Dismiss") at 18–21.) However, those arguments are premature. The Third Amended Complaint alleges damages in the form of multi-million dollar capital investments in anticipation of the oil exploration license. (Third Amended Complaint ¶ 30.) Those allegations are sufficient for purposes of the present motion.

a
The Third Amended Complaint Does Not Adequately Allege That Either Fridman Or Blavatnik
Intentionally Procured Grenada's Breach

The Third Amended Complaint asserts that Fridman and Blavatnik "persuaded Grenada

not to issue an oil and natural gas license to RSM." (Third Amended Complaint ¶ 60.)  In

support of this assertion, the Third Amended Complaint alleges two actions by Fridman and

Blavatnik: (1) payment of a bribe to Bowen, and (2) payment of Grenada's legal defense before

the ICSID tribunal.[23] (Id. ¶ 50.)

The general allegation with respect to bribery in the Third Amended Complaint is that:

"Melnicke revealed to Grynberg in early 2006 that Blavatnik and Fridman had bribed . . . Bowen

so that their group could develop the vast petroleum reserves believed to exist in the offshore

Grenadian Territory," and that "at least one of the meetings designed to discuss the scheme

occurred in New York, with Blavatnik, Fridman and Bowen all in attendance." (Third Amended

Complaint ¶ 50.)  There are no facts alleged with respect to when and where the bribe took place,

how the bribe monies were ultimately furnished, or, most importantly, whether Fridman and

Blavatnik's payment of the bribe even predated Grenada's decision to deny RSM's license

application.  Similarly, the Third Amended Complaint does not allege any facts stating that the

---

[23]  Within the context of Plaintiffs' claim for tortious interference with contract, the court will evaluate the allegation that Defendant Mikhail Fridman ("Fridman") and Blavatnik are funding Grenada's legal defense before the ICSID tribunal as a specific instance of bribery.  The independent "wrongfulness" of financing a third-party's legal fees is assessed in connection with Plaintiffs' claim for tortious interference with prospective business advantage, as that cause of action requires an allegation that the defendant acted "solely out of malice" or utilized "wrongful means."  See Section VII.B.2.

meeting between Blavatnik, Fridman, and Bowen predated Grenada's denial of RSM's license application.[24]

The specific allegation of bribery in the Third Amended Complaint is that Fridman and Blavatnik promised to fund, and are funding Grenada's legal defense in the ICSID claim for breach of contract initiated by RSM after its license application was denied.  As with the general allegation of bribery, the Third Amended Complaint makes no factual allegations at all regarding when the promise to fund Grenada's legal defense took place, whether the promise predated Grenada's decision to deny RSM's license application and, in fact, whether Blavatnik and Fridman ever fulfilled this promise.  To the contrary, according to The Third Amended Complaint, official Grenadian documents released to the public in 2007 state that Global Petroleum, and not Fridman or Blavatnik, has invested more than $4 million into Grenada's legal defense before the ICSID tribunal. (Third Amended Complaint ¶ 53.)  This specific allegation, that it was Global Petroleum that furnished payment for Grenada's legal defense, is entitled to be credited over the more general, conclusory assertion that it was Fridman and Blavatnik who did so.[25]  See Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1091 (2d Cir. 1995).

---

[24]  At oral argument, Counsel for Plaintiffs confirmed that it could not make any specific factual assertions regarding the alleged meeting, and stated: "We don't know precisely when the meeting took place between Messrs. Blavatnik, Fridman, and Minister Bowen.  We're not alleging that it took place in 2006 or when it took place." (Transcript Day 2, at 94:24 to 95: 2.)

[25]  The allegation in the Third Amended Complaint that Defendant Global Petroleum Group, Ltd. ("Global Petroleum") and its director, Defendant Lev Model ("Model"), are acting as "fronts" for Fridman and Blavatnik does nothing to alter this outcome. (See Third Amended Complaint ¶ 28.)  Even if the court were to construe the term "fronts" as a synonym for "agents," Plaintiffs' allegations would still be deficient, as the Third Amended Complaint does not allege any facts that indicate an agency relationship between Global Petroleum and any of the other Defendants.

b

<u>The Third Amended Complaint Does Not Allege That TNK-BP Took Any Action At All To Interfere With The Agreement And Does Not Adequately Allege That Either Fridman Or Blavatnik Were Acting As TNK-BP's Agents</u>

Plaintiffs' claim against TNK-BP is premised solely on the alleged actions of its directors, Fridman and Blavatnik.  According to Plaintiffs, both Fridman and Blavatnik were acting as agents for TNK-BP. (Third Amended Complaint ¶¶ 2, 3.)  However, Plaintiffs have not alleged any facts which establish an agency relationship between Fridman and Blavatnik and TNK-BP.  Plaintiffs "must do more than state the legal conclusion" that Fridman and Blavatnik were agents of TNK-BP; they "must plead facts that support a finding that such agency existed." <u>Maung Ng We v. Merrill Lynch & Co.</u>, No. 99 Civ. 9687 (CSH), 2000 WL 1159835, at *5 (S.D.N.Y. August 15, 2000) (mem.).  Plaintiffs have not stated any facts at all in support of their statement that Fridman and Blavatnik were acting as TNK-BP's agents and, thus, have failed to "allege an agency relationship sufficient to withstand dismissal." <u>See</u> <u>id.</u>

Fridman and Blavatnik's status as directors of TNK-BP does not alter this outcome. <u>See</u> <u>Congram v. Giella</u>, No. 91 Civ. 1134 (LMM), 1992 WL 349845, at *5 (S.D.N.Y. November 10, 1992) ("An agency relationship does not necessarily follow from . . . directorship; moreover, such a bare allegation is not sufficient to state a cause of action against the corporate entity."); 10 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 4877 (perm. ed., rev. vol. 2007) ("Where the tortfeasor is . . . a director[,] . . . liability is not established by the plaintiff's mere characterization of the tortfeasor's status as a director.").

As TNK-BP notes, "Plaintiffs may not bootstrap their claims by stating that others must have acted on behalf of TNK-BP . . . Plaintiffs plead no communications between TNK-BP and any other defendant (or any other facts) that support their 'inference' that Messrs. Blavatnik and

Fridman acted on TNK-BP's behalf." (Memorandum of Law in Further Support of Defendant

TNK-BP Limited's Motion to Dismiss the Second Amended Complaint at 4.)

c

<u>The Third Amended Complaint Does Not Allege That BP Took Any Action At All<br>To Interfere With The Agreement And Does Not Adequately Allege That<br>Either Fridman Or Blavatnik Were Acting As BP's Agents</u>

Plaintiffs do not allege any act or conduct connecting BP to either the bribes allegedly

paid to Bowen by Fridman and Blavatnik, or the alleged payment of Grenada's legal fees in the

ICSID proceedings.[26] (<u>See</u> Third Amended Complaint ¶ 50.)  According to Plaintiffs, both

Fridman and Blavatnik were acting as agents for BP. (<u>Id.</u> ¶¶ 2, 3.)  However, as with TNK-BP,

Plaintiffs have not alleged any facts that support its assertion that Fridman and Blavatnik were

acting as BP's agents.[27]  Accordingly, Plaintiffs' conclusory allegations regarding the agency

relationship, coupled with its failure to allege that BP took any actions at all with respect to

---

[26]  At oral argument, Counsel for Plaintiffs acknowledged that its agency allegations with respect to BP were based on what he considered "reasonable inferences." (Transcript Day 2, at 43:14–21.)  When asked about the viability of the claims against BP in the event the claims against Fridman and Blavatnik were dismissed, Counsel for Plaintiffs responded: "I think it's safe to say that the case against BP . . . is dependent on you accepting the allegations vis-a-vis Fridman and Blavatnik." (<u>Id.</u> at 44:11–14.)

[27]  In addition to the failure to plead any of the elements of an agency relationship, Plaintiffs have premised their entire claim against BP on speculative inferences.

Plaintiffs state that their decision to add BP as a defendant in this action was based on Bowen's testimony before the ICSID tribunal that "a petroleum company doing business in the same geographic areas as BP is aligned with Blavatnik and Fridman as part of Global Petroleum Group." (Third Amended Complaint ¶ 52; <u>see</u> Plaintiffs' Opposition to BP's and Browne's Motion at 13.) This rationale is deficient in two respects: first, because Bowen never mentioned BP; and, second, even if Bowen had mentioned BP, he did not allege an agency relationship but only that the company was "aligned" with Global Petroleum.

Moreover, Plaintiffs now contend that because Model and Global Petroleum are in default, they "therefore admit all of the allegations" against them.  (Plaintiffs' Opposition to BP's and Browne's Motion at 11.)  According to Plaintiffs, this "admission" bolsters its "reasonable inference" that "BP is an active participant in the conspiracy to interfere with RSM's exclusive contract." (<u>Id.</u> at 10–11.)  This inference is far from reasonable.  The default by Global Petroleum and Model has no effect whatsoever on Plaintiffs' claims against the other Defendants; this is true even if the court grants Plaintiffs' Motions for Default Judgment, discussed in Section VIII.  <u>See</u> Fed. R. Civ. P. 54(b) ("[A]ny . . . decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties."); <u>see also</u> <u>Holt v. Holt</u>, 262 A.D.2d 530, 530–31 (N.Y. App. Div. 1999).

33

Grenada's breach of the Agreement, are not sufficient to survive a motion to dismiss. See Maung Ng We, 2000 WL 1159835, at *5.

d

**The Third Amended Complaint Does Not Allege That Browne Took Any Action At All To Interfere With The Agreement Or That Fridman and Blavatnik Were Acting As Browne's Agents**

The Third Amended Complaint does not allege that Browne took any action at all with respect to Grenada's breach of the Agreement.[28]  Moreover, it does not even allege that Fridman and Blavatnik were acting as agents for Browne.[29]  Plaintiffs' claims against BP are predicated entirely on Browne's former position as Chief Executive Officer of BP. (See Third Amended Complaint ¶¶ 9, 10, 14, 15, 18, 24, 28.)  Thus, Plaintiffs' allegations against Browne must fail because a corporate officer cannot be held individually liable for alleged tortious interference by

---

[28]  Plaintiffs have, however, alleged that "Browne has . . . recently been found to have committed a criminal contempt of court for lying to a UK High court Judge during an attempt to cover up a news story concerning claims of wrongdoing by a former boyfriend." (Third Amended Complaint ¶ 24.)  According to Plaintiffs, because "Browne was . . . convicted in the Spring of 2007 of criminal contempt, . . . Browne . . . had no reservations about throwing bribe money around, and a collaboration with the likes of Fridman, TNK and Lev Model (a convicted criminal with ties to the Russian petroleum industry) made perfect business sense." (Plaintiffs' Opposition to BP's and Browne's Motion at 6–7.)  This information is both irrelevant and incorrect.  At oral argument, Counsel for Browne clarified that Browne was never convicted of criminal contempt and that, in fact, the UK High Court Judge declined to impose sanctions because the publicity associated with the situation was punishment enough. (Transcript Day 2, at 75:18–22.)  Plaintiffs' Counsel admitted that the allegation was taken from a newspaper article with no effort made to verify through judicial records.  Given the false and scandalous nature of Plaintiffs' allegation, failure to do so is a prime facie violation of Fed. R. Civ. P. 11(b)'s requirement of reasonable inquiry.

[29]  Plaintiffs state in their opposition that "they believe they can prove either that . . . Browne authorized Fridman and Blavatnik to bribe Bowen, or that . . . Browne ratified their actions." (Plaintiffs' Opposition to BP's and Browne's Motion at 13.)  This belief does not alter the fact that Plaintiffs did not make any such allegations in the Third Amended Complaint.

34

its corporate employer. <u>World Wide Commc'ns</u>, 1997 U.S. Dist. LEXIS 20596, at *35;[30]

<u>Houbigant, Inc. v. Dev. Specialists, Inc.</u>, 229 F. Supp. 2d 208, 222 (S.D.N.Y. 2002).

### 2
### The Third Amended Complaint Does Not Adequately Allege That Grenada Breached The Agreement

Plaintiffs have not sufficiently alleged breach of the Agreement.  The Second Circuit has

adopted a formalistic approach to determining whether a plaintiff has properly alleged breach of

a contract in a tortious interference claim. <u>See</u> <u>Kirch</u>, 449 F.3d at 402.  In <u>Kirch</u>, the court

affirmed the dismissal of a tortious interference with contract claim on the basis that "plaintiffs

fail[ed] to allege . . . actual breach" of a contract when it said that the contracting party had

"walked away" from the project and that the project "fell apart" because such statements did "not

amount to an allegation that [the contracting party] violated the terms of a contract." <u>Id.</u>

The Third Amended Complaint alleges that the agreement imposed a "90-day application

period." (Third Amended Complaint ¶ 35.)  It claims that RSM filed its license application more

than eight years after the Agreement was executed and 92 days after it attempted to revoke the

<u>force</u> <u>majeure</u>, and that the license application was ultimately denied as "untimely filed." (<u>Id.</u> ¶¶

12, 29, 31–32, and 34.)  The Third Amended Complaint does not state that the Agreement

prohibited Grenada from denying a license application on procedural grounds, and Plaintiffs do

not allege how Grenada's denial of RSM's license application "actually violated the terms" of

the Agreement. <u>Kirch</u>, 449 F.3d at 402.  Thus, Plaintiffs' statement that Grenada denied RSM's

---

[30]  At oral argument, Counsel for Plaintiffs acknowledged this principle.  Nevertheless, when asked whether he agreed with the standard articulated in <u>World-Wide Communications, Inc. v. Rozar</u>, No. 96 Civ. 1056 (MBM), 1997 U.S. Dist. LEXIS 20596 (S.D.N.Y. December 30, 1997), Counsel for Plaintiffs responded that "Browne is sued here because we have made the inference that having received the opportunity in 1999, he played a critical part in terms of passing the information along so that his codefendants knew with whom to deal . . . and where to go and where to hopefully from their perspective secure an improper advantage in the government, within the government of Grenada and Grenada's offshore waters. . . . We don't take issue with the [<u>World-Wide</u>] standard." (Transcript Day 2, at 37:25 to 38:9.)

application as untimely "does not amount to an allegation that [Grenada] violated the terms of a contract." See id.

**3**
**The Third Amended Complaint Does Not Adequately Allege That Defendants Were The "But For" Cause Of Grenada's Breach**

The Third Amended Complaint specifically states that Grenada was predisposed to breach the Agreement as early as 1996, and thus does not adequately allege that any of the Defendants were the "but-for" cause of Grenada's alleged breach of the Agreement.  If a defendant can demonstrate that the third-party was predisposed toward breaching the contract even in the absence of the alleged interference, a plaintiff cannot establish "but for" causation. Granite Partners, L.P. v. Bear, Stearns & Co., 17 F. Supp. 2d 275, 293–94 (S.D.N.Y. 1998); Mina Inv. Holdings, 16 F. Supp. 2d at 360–61.

The Third Amended Complaint offers only bare conclusory assertions about causation.  It states that "each individual and corporate Defendant, in his own way is an integral part of the deliberate scheme to interfere with RSM's exclusive contract and economic relationship with Grenada, and therefore a cause-in-fact and proximate cause of Plaintiffs' damages." (Third Amended Complaint ¶¶ 63, 67.)  This is recitation of the applicable legal standard "without any relevant supporting facts" and, accordingly, "is insufficient to state a cause of action for tortious interference with contractual relations." See Granite Partners, 17 F. Supp. 2d at 294; see also In re Am. Express Co. S'holder Lit., 39 F.3d 395, 400 n.3 (2d Cir. 1994) (conclusory allegations of proximate cause "need not be accepted as true for purposes of ruling on a motion to dismiss").

In any event, Plaintiffs' allegations are self-defeating. The Third Amended Complaint states that Bowen "obstructed, harassed and intimidated RSM and Grynberg in their efforts to explore, develop, and produce Grenada's oil and gas natural resources" after RSM and Grynberg

refused to furnish bribe monies to Bowen in 1996. (Third Amended Complaint ¶ 15.)  This specific allegation that the impetus for Grenada's breach was caused by RSM's refusal to furnish the bribe monies requested belies the general, conclusory allegation that any of the Defendants were the proximate cause. See Hirsch, 72 F.3d at 1091 ("General, conclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint."). Thus, because the Third Amended Complaint alleges that Bowen exhibited a predisposition toward breaching the Agreement independent of the alleged involvement of any of the Defendants, Plaintiffs cannot establish "but for" causation.  See Granite Partners, 17 F. Supp. 2d at 293-94; Mina Inv. Holdings, 16 F. Supp. 2d at 360-61.

**B**
**The Third Amended Complaint Does Not State A Claim**
**For Tortious Interference With Prospective Business Advantages**

Under New York law, to state a claim for tortious interference with prospective business advantages,[31] the plaintiff must allege that: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship."[32] Kirch, 449 F.3d at 400 (quoting Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003)).

---

[31] This cause of action is often referred to "by a number of different names, including prospective economic advantage, beneficial business relations, prospective business advantage, and business or economic relations"; the same legal standard is applied regardless of which name is used. Henneberry v. Sumitomo Corp. of Am., 415 F. Supp. 2d 423, 465 n.23 (S.D.N.Y. 2006) (citations and internal quotation omitted).

[32] The elements are similar under Colorado law, except that the tort is referred to as "tortious interference with prospective business relation."  To state a claim for tortious interference with prospective business relation under Colorado law, a plaintiff must allege: (1) the existence of a prospective contractual relations between itself and a third party; (2) the defendant's intentional interference with the prospective business relation; (3) that the defendant used improper means; and (4) that the defendant's interference caused the plaintiff to lose the benefits of the relation. See Amoco Oil Co. v. Ervin, 908 P.2d 493, 500 (Colo. 1995).

The Third Amended Complaint adequately alleges that Defendants knew of the existence of the alleged relationship between RSM and Grenada. (Third Amended Complaint ¶¶ 28, 61.) However, the Third Amended Complaint fails to properly allege any cognizable facts with the requisite level of specificity required on a motion to dismiss in support of any of the remaining elements, as discussed below.

**1**
**The Third Amended Complaint Does Not Adequately Allege The Existence Of A Business Relationship Between RSM And Grenada**

Plaintiffs must demonstrate that, at the time of Defendants' alleged interference, Plaintiffs were engaged in "a continuing business or other customary relationship not amounting to a formal contract" with Grenada. See Hannex Corp. v. GMI, Inc., 140 F.3d 194, 205 (2d Cir. 1998) (quoting Restatement (Second) of Torts § 766B cmt. c (1979)).  Plaintiffs cannot merely re-package their tortious interference with contract claim as a claim for tortious interference with prospective business relations. See, e.g., Antonios A. Alevizopoulos & Assoc. v. Comcast Int'l Holdings, Inc., 100 F. Supp. 2d 178, 187 (S.D.N.Y. 2000); Aramony v. United Way of Am., 949 F. Supp. 1080, 1084 (S.D.N.Y. 1996).

There is no distinction in the Third Amended Complaint between Plaintiffs' claims for tortious interference with contract and tortious interference with prospective business relations. Indeed, in attempting to establish the elements of this cause of action, Plaintiffs repeatedly refer to the alleged contract between RSM and Grenada.  For example, Plaintiffs state that "[t]he Defendants have persuaded Grenada not to issue . . . an oil and natural gas license to RSM as required by an exclusive existing contract" and that "[e]ach individual Defendant are and were at all relevant times aware of the exclusive contract and economic relationship between RSM and Grenada." (Third Amended Complaint ¶¶ 60–61.)  In fact, the "prospective business advantage"

38

referred to by Plaintiffs is "the issuance of an oil and natural gas exploration, development and production license by Grenada to Plaintiffs" (id. ¶ 61); the issuance of that license was dependent upon Grenada honoring its alleged contract with RSM.[33]

**2**
**The Third Amended Complaint Does Not Adequately Allege That Defendants Acted "Out Of Malice" Or Otherwise Used Improper Means**

As previously discussed, the only two actions alleged in the Third Amended Complaint are the alleged bribes paid to Bowen and the alleged payment of Grenada's legal fees arising from the ICSID dispute. Plaintiffs cannot establish a claim for tortious interference with prospective business advantages unless the Third Amended Complaint alleges that Fridman and Blavatnik acted solely "out of malice" or otherwise used "improper means."[34] See Kirch, 449 F.3d at 400. It does not.

Fridman's and Blavatnik's actions, with respect to both the alleged bribe and the alleged payment of legal fees, do not rise to the level of actions taken solely out of malice. This is because an action taken in economic self-interest is not an action taken "for the sole purpose of inflicting intentional harm on plaintiffs." Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190–91 (2004). The Third Amended Complaint specifically states that Fridman and Blavatnik "bribed . . . Bowen so that their group could develop the vast petroleum reserves believed to exist in the offshore Grenadian territory" (Third Amended Complaint ¶ 50), i.e. to further their economic self-interest.

---

[33] As Plaintiffs understand the distinction between the two causes of action, the differentiating factor is the allegation of bribery. According to Counsel for Plaintiffs, "[i]f there was no bribe . . . we would have a cause of action for tortious interference with contract, not tortious interference with economic advantage." (Transcript Day 2, at 30:24 to 31:2.)

[34] These are the same actions analyzed under the claim for tortious interference with contract. See Section VII.A.1(a). For the reasons articulated in Sections VII.A.1(b)–(d), none of the other Defendants can be held liable for the actions of Fridman and Blavatnik.

Nor does the Third Amended Complaint allege that Fridman and Blavatnik used wrongful means.  In order to constitute "wrongful means," the conduct complained of must be "criminal or independently tortious." Carvel Corp., 3 N.Y.3d at 192.  The alleged bribe might possibly constitute a violation of the Foreign Corrupt Practices Act ("FCPA"), if the U.S. Department of Justice decided to prosecute Fridman and Blavatnik for engaging in such activity. However, there is no private right of enforcement under the FCPA. Citicorp Int'l Trading Co. v. W. Oil & Ref. Co., 771 F. Supp. 600, 606–07 (S.D.N.Y. 1991).  The alleged funding of Grenada's legal defense, standing alone, cannot constitute "wrongful means" either, as it is neither criminal nor independently tortious.[35]  The doctrine of champerty, which "involves the unlawful maintenance of a suit in consideration of a bargain for some part of the thing involved," is not actionable in New York "except as provided by statute." Coopers & Lybrand v. Levitt, 52 A.D.2d 493, 497 (N.Y. App. Div. 1976).  That statute, Judiciary Law § 489, prohibits the purchase of claims by corporations or collection agencies with the specific purpose of bringing an action thereon. Id.  It does not apply here.

**3**
**The Third Amended Complaint Does Not Adequately Allege That Defendants' Interference Caused Injury To The Relationship Between RSM And Grenada**

The fourth element of a claim for tortious interference with prospective business advantages is addressed to proximate causation.  See State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 171 (2d Cir. 2004).  Plaintiffs' general, conclusory assertion that "each . . . Defendant, in its own way is" the proximate cause of Grenada's alleged breach (Third Amended Complaint ¶ 63), is belied by the more specific

---

[35]  Plaintiffs acknowledged at oral argument that "there's nothing wrong with paying someone else's legal fees," but stated that "if it's tied up with bribery," there is. (Transcript Day 2, at 35:13–14.)

allegations in the Third Amended Complaint that Plaintiffs' refusal to furnish bribe monies to Bowen caused Grenada to sever its relationship with Plaintiffs (id. ¶ 15).[36]

## C
## The Third Amended Complaint Does Not State a Cause of Action for Civil Conspiracy

There is no independent tort of conspiracy under New York law. Kirch, 449 F.3d at 401 (quoting Alexander & Alexander of N.Y., Inc. v. Fritzen, 503 N.E.2d 102, 102 (N.Y. 1986) (mem.) ("[A]s we long ago held, a mere conspiracy to commit a tort is never of itself a cause of action")); accord Small v. Lorillard Tobacco Co., 94 N.Y.2d 43, 57 (1999).

In this case, because Plaintiffs fail to state causes of action for either of the torts underlying the alleged conspiracy, tortious interference with prospective business advantages and tortious interference with contract (see Sections VII.A–B), they cannot possibly state an actionable claim for civil conspiracy under New York law.  Accordingly, Plaintiffs' claim for civil conspiracy is dismissed against all appearing Defendants.[37]

---

[36] See Section VII.A.3 for a detailed analysis of this issue.

[37] Colorado law does recognize actions for civil conspiracy without the underlying tort, see Nelson v. Elway, 908 P.2d 102, 106 (Colo. 1995).  Even if Colorado law applied, however, Defendants' motions to dismiss this claim would be granted because Plaintiffs have failed to allege facts supporting each of the required elements. To state a claim for civil conspiracy under Colorado law, Plaintiffs must allege: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or cause of action; (4) an overt or unlawful act; and (5) damages as to the proximate cause." Id.  As with the tortious interference claims, Plaintiffs' claim for civil conspiracy fails because Plaintiffs have failed to allege that any of the Defendants engaged in any unlawful act, that the Defendants had a meeting of the minds with respect to the alleged breach of the Agreement, and that the Defendants' actions were the proximate cause of any damages allegedly suffered by Plaintiffs.  For this reason, the court need not address Bowen's additional argument that the civil conspiracy claim is time-barred under Colorado law.
    At oral argument, Plaintiffs asserted that although they "don't have proof . . . of a conspiracy . . . they have stated reasonable inferences that suggest a conspiracy." (Transcript Day 2, at 91:7–10.)

**D**

**Plaintiffs' Request For Leave To Replead Is Denied Because Further Amendment Will Not Cure the Deficiencies Identified In The Third Amended Complaint**

Plaintiffs' request for leave to replead in the event of dismissal is denied.  Plaintiffs have already been given three opportunities to amend their pleadings.  The Third Amended Complaint dismissed in this action contains the fourth iteration of Plaintiffs' allegations.  There is nothing to suggest that affording Plaintiffs a fourth opportunity to amend will cure the deficiencies discussed in Sections VII.A through C above.  The Third Amended Complaint is devoid of factual support for each of the causes of action alleged therein and is, instead, based almost entirely on speculation and inference stacked upon inference.

Given these deficiencies, Plaintiffs' Third Amended Complaint is dismissed without leave to replead.  See, e.g., Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (affirming dismissal of complaint without leave to replead because "[t]he problem with [Plaintiff's] causes of action is substantive; better pleading will not cure it."); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999) (affirming dismissal of complaint without leave to replead where "[t]here is nothing to suggest that appellants could replead in a fashion which would sufficiently allege" the claim asserted); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) (noting that "where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice").

**VIII**

**PLAINTIFFS' APPLICATIONS FOR DEFAULT JUDGMENT ARE DENIED**

Plaintiffs' Applications for Default Judgment with respect to non-appearing Defendants Model and Global Petroleum are denied because Plaintiffs' allegations are equally deficient with respect to these Defendants.

More than 125 years ago, the Supreme Court held that when a defendant defaults in an action asserting joint liability, judgment should not be entered against the defaulting defendant until the matter has been resolved against the other defendants or else the defaulting defendant will have "lost his standing in court." Frow v. De La Vega, 82 U.S. 552, 554, 21 L. Ed. 60 (1872).  However, the Court held, if the suit is dismissed against the remaining defendants, the defaulting defendant will be allowed to benefit from that dismissal.  Id.  This result was followed by the Second Circuit in Davis v. National Mortgagee Corp., 349 F.2d 175, 178 (2d Cir. 1965).  In a later case, the Second Circuit took the position that "at most, Frow controls in situations where the liability of one defendant necessarily depends upon the liability of the others," i.e., where liability is joint. Int'l Controls Corp. v. Vesco, 535 F.2d 743, 746 n.4 (2d Cir. 1976) (citation omitted).

In any event, while it is within the court's discretion to enter a default judgment against non-appearing defendants when a complaint is dismissed against all other defendants, there is no requirement that the court do so.  In deciding whether to extend Frow to situations in which liability is joint and several, the key "is to recognize that the Frow principle is designed to apply only when it is necessary that the relief against the defendants be consistent.  If that is not the case, then a default against one defendant may stand, even though the remaining defendants are found not liable." 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure: Civil 3d § 2690, at 77 (3d ed. 1998).  Thus, the relevant analytical inquiry is one of propriety.[38]

---

[38]   At oral argument, Counsel for Plaintiffs referred the court to Farberware, Inc. v. Groben, No. 89 Civ. 6240 (PKL), 1991 U.S. Dist. LEXIS 8994, at *9–10 (S.D.N.Y. July 3, 1991), for the proposition that when appearing defendants have been dismissed, the court may look to see if the non-appearing defendants are similarly situated in determining whether the non-appearing defendants are beneficiaries of the same arguments. (Transcript Day 2, at 5:9–15.)

Here, the Third Amended Complaint is dismissed as to all appearing Defendants, principally on the ground that its factual allegations do not support any legally cognizable claim. Plaintiffs' allegations that Model and Global Petroleum Group serve as "fronts for Fridman's, Blavatnik's, BP's, and TNK-BP's efforts to bribe Grenadian officials" (Third Amended Complaint ¶ 28) suffers from the same defects as their allegations against the appearing Defendants: they are not based on any cognizable facts properly before the court.  Indeed, they are based on the same wishful thinking, both as to the claims asserted and as to the legal standards for filing a complaint, as Plaintiffs' allegations with respect to the appearing Defendants.  Accordingly, the entry of a default judgment against the remaining Defendants would be inappropriate.

## IX
## CONCLUSION

Because the Third Amended Complaint reflects a profound and fundamental misunderstanding of the legal and procedural requirements for filing a complaint in a United States court, TNK-BP's Motion to Strike is granted in part and denied in part, the Third Amended Complaint is dismissed with prejudice against all Defendants, and Plaintiffs' Applications for Default Judgment against Model and Global Petroleum are denied.

_/s/ Evan J. Wallach_____
Evan J. Wallach, Judge

Dated: February 19, 2009
        New York, New York